**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATIONAL WILDLIFE FEDERATION;
IDAHO WILDLIFE FEDERATION;
WASHINGTON WILDLIFE FEDERATION;
SIERRA CLUB; TROUT UNLIMITED;
PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATIONS;
INSTITUTE FOR FISHERIES RESOURCES;
IDAHO RIVERS UNITED; IDAHO
STEELHEAD AND SALMON UNITED;
NORTHWEST SPORT FISHING
INDUSTRY ASSOCIATION, SALMON FOR
ALL; COLUMBIA RIVERKEEPER; NW
ENERGY COALITION; FEDERATION OF
FLY FISHERS; AMERICAN RIVERS,
INC.; EASTERN OREGON IRRIGATORS
ASSOCIATION,
                    *Plaintiffs-Appellees,*

                    v.

NATIONAL MARINE FISHERIES
SERVICE; UNITED STATES ARMY
CORPS OF ENGINEERS; U.S.
BUREAU OF RECLAMATION; DONALD
L. EVANS, in his official capacity

No. 06-35011

D.C. Nos.
CV-01-00640-JAR
05-00023-JAR

as Secretary of Commerce; NOAA
Fisheries; D. Robert Lohn, in his
official capacity as Regional
Direct of NOAA Fisheries,

*Defendants,*

Northwest Irrigation Utilities;
Public Power Council; BPA
Customer Group; Franklin
County Farm Bureau Federation;
Grant County Farm Board
Federation; Washington Farm
Bureau Federation; Clarkson
Golf & Country Club; State of
Montana; Kootenai Tribe of
Idaho,

*Defendant-Intervenors,*

and

State of Oregon,

*Plaintiff-Intervenor-
Appellee,*

State of Idaho,

*Defendant-Intervenor-
Appellant.*

NATIONAL WILDLIFE FEDERATION;
IDAHO WILDLIFE FEDERATION;
WASHINGTON WILDLIFE FEDERATION;
SIERRA CLUB; TROUT UNLIMITED;
PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATIONS;
INSTITUTE FOR FISHERIES RESOURCES;
IDAHO RIVERS UNITED; IDAHO
STEELHEAD AND SALMON UNITED;
NORTHWEST SPORT FISHING
INDUSTRY ASSOCIATION, SALMON FOR
ALL; COLUMBIA RIVERKEEPER; NW
ENERGY COALITION; FEDERATION OF
FLY FISHERS; AMERICAN RIVERS,
INC.; EASTERN OREGON IRRIGATORS
ASSOCIATION,
                *Plaintiffs-Appellees,*

                        v.

NATIONAL MARINE FISHERIES
SERVICE; UNITED STATES ARMY
CORPS OF ENGINEERS; U.S.
BUREAU OF RECLAMATION,
                *Defendants-Appellants,*

STATE OF OREGON,
                *Plaintiff-Intervenor-*
                        *Appellee,*

                    and

No. 06-35019

D.C. No.
CV-01-00640-JAR

AMENDED
OPINION

DONALD L. EVANS, in his official
capacity as Secretary of
Commerce; NOAA FISHERIES; D.
ROBERT LOHN, in his official
capacity as Regional Director of
NOAA Fisheries,
                            *Defendants,*

NORTHWEST IRRIGATION UTILITIES;
PUBLIC POWER COUNCIL; BPA
CUSTOMER GROUP; FRANKLIN
COUNTY FARM BUREAU FEDERATION;
GRANT COUNTY FARM BOARD
FEDERATION; WASHINGTON FARM
BUREAU FEDERATION; STATE OF
IDAHO; CLARKSON GOLF &
COUNTRY CLUB; STATE OF
MONTANA; KOOTENAI TRIBE OF
IDAHO,
                *Defendant-Intervenors.*

Appeal from the United States District Court
for the District of Oregon
James A. Redden, District Judge, Presiding

Argued and Submitted
June 1, 2006—San Francisco, California

Filed April 9, 2007
Amended April 24, 2008

Before: A. Wallace Tashima, Sidney R. Thomas, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Thomas

## COUNSEL

Mark Eames, NOAA Office of General Counsel, Seattle, Washington; Gayle Lear, Assistant Division Counsel, Northwestern Division, U.S. Army Corps of Engineers, Portland, Oregon; Kelly A. Johnson, Acting Assistant Attorney General, Fred Disheroon, Ruth Ann Lowery, Ellen J. Durkee, and Jennifer L. Scheller, Attorneys, Environment & Natural Resources Division, U.S. Department of Justice, Washington D.C., for federal defendants-appellants.

Matthew A. Love and Sam Kalen, Van Ness Feldman, P.C., Seattle, Washington, for defendants-appellants BPA Customer Group.

Lawrence G. Wasden, Attorney General, Clive J. Strong, Deputy Attorney General, and Clay R. Smith, Deputy Attorney General, State of Idaho, Boise, Idaho, for defendant-intervenor-appellant State of Idaho.

Todd D. True and Stephen D. Mashuda, Earthjustice, Seattle, Washington; Daniel J. Rohlf, Pacific Environmental Advocacy Center, Portland, Oregon, for plaintiffs-appellees National Wildlife Federation.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, David E. Leith, Assistant Attorney General, and Stephen K. Bushong, State of Oregon, Salem, Oregon, for plaintiff-intervenor-appellee State of Oregon.

Koward G. Arnett, Karnopp Petersen, LLP, Bend, Oregon; David J. Cummings, Nez Perce Tribe, Lapwai, Idaho; Christopher B. Leahy, Fredericks, Pelcyger & Hester, LLC, Louisville, Colorado; Tim Weaver, Law Offices of Tim Weaver, Yakima, Washington, for amici curiae Treaty Tribes.

Robert D. Thornton and Paul S. Weiland, Nossaman, Guthner, Knox & Elliott, LLP, Irvine, California, for amicus curiae

National Association of Homebuilders. Rob McKenna, Attorney General, and Michael S. Grossman, Assistant Attorney General, State of Washington, Olympia, Washington, for amicus curiae State of Washington.

John C. Bruning, Attorney General, David D. Cookson, Assistant Attorney General, State of Nebraska, Lincoln, Nebraska; Thomas R. Wilmoth, Special Assistant Attorney General, Fennemore Craig, P.C., Lincoln, Nebraska, for amicus curiae State of Nebraska.

James L. Buchal, Murphy & Buchal LLP, Portland, Oregon, for amicus curiae Columbia Snake River Irrigators Association.

Russell C. Brooks, Bellevue, Washington; M. Reed Hopper and Scott A. Sommerdorf, Pacific Legal Foundation, Sacramento, California, for amicus curiae Washington Farm Bureau Federation.

---

## OPINION

THOMAS, Circuit Judge:

These consolidated appeals bring us once more to the Pacific Northwest, for another round in the complex and long-running battle over salmon and steelhead listed under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544. In this ESA action brought by the National Wildlife Federation and other plaintiffs (collectively "NWF"), we consider a November 2004 Biological Opinion ("2004 BiOp") addressing the effects of proposed operations of Federal Columbia River Power System ("FCRPS" or "Columbia River System") dams and related facilities on listed fish in the lower Columbia and Snake Rivers. The 2004 BiOp, issued by the agency formerly known as the National Marine Fisheries Service of

the National Oceanic and Atmospheric Administration ("NMFS"),[1] found that proposed FCRPS operations for 2004 through 2014 would not jeopardize the thirteen area salmonid species that are listed as threatened or endangered, nor adversely modify their critical habitat. NMFS and the State of Idaho (collectively "NMFS") appeal from the district court's determination that the 2004 BiOp was structurally flawed and from certain portions of its remand order. We affirm.

I

The factual and procedural history of this case was detailed in our prior opinion. *NWF v. NMFS*, 422 F.3d 782, 800 (9th Cir. 2005). As background, and for convenience of reference, we will briefly review the proceedings to date to place the present controversy in context.

Every year hundreds of thousands of salmon and steelhead travel up and down the Columbia River and its tributaries, hatching in fresh water, migrating downstream to the sea to achieve adulthood, and then returning upstream to spawn. The wild Pacific salmon population has significantly decreased in recent years, and a number of species of Columbia, Snake, and Willamette River salmon and steelhead are now protected by the Endangered Species Act.[2] Each of the affected stocks migrates at a different time of the year to different parts of the Columbia Basin.

---

[1] The agency is now NOAA Fisheries. Because much of the record before us uses the prior name, we shall refer to the agency as "NMFS" in this opinion.

[2] Snake River Chinook salmon (fall-run); Snake River Chinook salmon (spring/summer-run); Snake River sockeye salmon; Upper Columbia River steelhead; Snake River Basin steelhead; Lower Columbia River coho salmon; Lower Columbia River steelhead; Middle Columbia River steelhead; Upper Willamette River steelhead; Lower Columbia River Chinook salmon; Upper Willamette River Chinook salmon; Upper Columbia River Chinook salmon (spring-run); and Columbia River chum salmon.

At issue in this case are the fall juvenile Chinook salmon and steelhead migrating downstream to the Pacific Ocean. These fish must pass a number of dams on their journey to the sea and suffer a very high mortality rate in doing so. Each dam in the migration corridor of the mainstream Snake and Columbia Rivers has a bypass system. At some dams, the bypass consists of screens in front of the turbine intakes that divert the salmon and steelhead into a passageway through the dam and downstream. At others, the bypass system diverts the fish into barges for transportation around the dam.

A number of federal, state, and tribal entities are involved in the operation of the Columbia River System. The U.S. Army Corps of Engineers and the Bureau of Reclamation manage the dams for multi-purpose operations; the Bonneville Power Administration manages federal power generated from the dams; and the Federal Energy Regulatory Commission plays a number of roles, including licensing of non-federal hydro-power projects. State regulation impacts the system through governance of water diversions from the river and state conservation programs. A number of federally recognized Indian Tribes retain treaty fishing rights in the waters of the Columbia River System.[3]

The issue before us is application of the ESA on the management of the Columbia River System. Section 7 of the ESA requires federal agencies, in consultation with what is known as the "consulting agency," to conserve species listed under the ESA. The Section requires federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any

---

[3]*See, e.g.*, Treaty with the Nez Perces, art. 3, June 11, 1855, 12 Stat. 957; Treaty with the Tribes of the Middle Oregon (Confederated Tribes of the Warm Springs Reservation of Oregon), June 25, 1855, 12 Stat. 963; Treaty with the Yakima, June 9, 1855, 12 Stat. 951; Treaty with the Wallawalla, Cayuse, et al. (Confederated Tribes of the Umatilla Indian Reservation), June 9, 1855, 12 Stat. 945. In their amici brief, the treaty tribes support the position of NWF in this action.

endangered species or threatened species or result in the destruction or adverse modification of [designated critical] habitat . . . ." 15 U.S.C. § 1536(a)(2). The ESA imposes a procedural consultation duty whenever a federal action may affect an ESA-listed species. *Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985). The agencies charged with implementing the ESA have promulgated a regulation clarifying that "Section 7 and the requirements of this part apply to all actions in which there is *discretionary* Federal involvement or control." 50 C.F.R. § 402.03 (emphasis added). Thus, where there is such discretionary involvement or control, the agency planning the action, usually known as the "action agency," must consult with the consulting agency. This process is known as a "Section 7" consultation. The process is usually initiated by a formal written request by the action agency to the consulting agency. After consultation, investigation, and analysis, the consulting agency then prepares a biological opinion. *See generally Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1239 (9th Cir. 2001). In this case, the action agencies are the U.S. Army Corps of Engineers and the Bureau of Reclamation, while the consulting agency is NMFS.

The consulting agency evaluates the effects of the proposed action on the survival of species and any potential destruction or adverse modification of critical habitat in a biological opinion, 16 U.S.C. § 1536(b), based on "the best scientific and commercial data available," *id.* § 1536(a)(2). The biological opinion includes a summary of the information upon which the opinion is based, a discussion of the effects of the action on listed species or critical habitat, and the consulting agency's opinion on "whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat . . . ." 50 C.F.R. § 402.14(h)(3). In making its jeopardy determination, the consulting agency evaluates "the current status of the listed species or critical habitat," the "effects of the action," and "cumulative effects." *Id.* § 402.14(g)(2)-(3). "Effects of the

action" include both direct and indirect effects of an action "that will be added to the environmental baseline." *Id.* § 402.02. The environmental baseline includes "the past and present impacts of all Federal, State or private actions and other human activities in the action area" and "the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation." *Id.* If the biological opinion concludes that jeopardy is not likely and that there will not be adverse modification of critical habitat, or that there is a "reasonable and prudent alternative[ ]" to the agency action that avoids jeopardy and adverse modification and that the incidental taking of endangered or threatened species will not violate section 7(a)(2), the consulting agency can issue an "Incidental Take Statement" which, if followed, exempts the action agency from the prohibition on takings[4] found in Section 9 of the ESA. 16 U.S.C. § 1536(b)(4); *ALCOA v. BPA*, 175 F.3d 1156, 1159 (9th Cir. 1999).

If the consulting agency concludes that an action agency's action may jeopardize the survival of species protected by the ESA, or adversely modify a species' critical habitat, the action must be modified. *ALCOA*, 175 F.3d at 1159. The consulting agency may recommend a "reasonable and prudent alternative" to the agency's proposed action. 16 U.S.C. § 1536(b)(3)(A).

The issuance of a biological opinion is considered a final agency action, and therefore subject to judicial review. *Bennett v. Spear*, 520 U.S. 154, 178 (1997); *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1235.

The ESA, as it applies here to the protection of anadromous fish, requires action agencies — here the U.S. Army Corps of

---

[4]"The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

Engineers and the Bureau of Reclamation — to consult NMFS to ensure that an agency's actions do not jeopardize an ESA-protected species or adversely modify their critical habitat. 16 U.S.C. § 1536(a)-(b).

Snake River fall Chinook salmon were listed as threatened species in 1992. In 1993, NMFS issued a biological opinion concluding that FCRPS operations would not jeopardize the listed species. The Idaho Department of Fish and Game challenged that opinion. In granting summary judgment for the plaintiff, the district court held that NMFS's action in issuing the 1993 biological opinion was arbitrary and capricious because NMFS had failed adequately to explain several of the key assumptions in its jeopardy analysis. *See Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 850 F. Supp. 886, 900 (D. Or. 1994). This decision was vacated on appeal as moot because NMFS had issued a subsequent biological opinion. *Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1071, 1075 (9th Cir. 1995). After further litigation and agency action not directly relevant to this case, NMFS issued a new biological opinion on December 21, 2000, (the "2000 BiOp") that superseded the previous biological opinions.

The 2000 BiOp determined that the continued operation of FCRPS as proposed by the action agencies would jeopardize eight listed salmon and steelhead species. Specifically, NMFS found that the "effects of the proposed or continuing action, the effects of the environmental baseline, and any cumulative effects, and considering measures for survival and recovery specific to other life stages," would leave the eight species with too low a likelihood of survival and population recovery. NMFS thus explored reasonable and prudent alternatives to the proposed operation and analyzed whether these alternatives, in conjunction with the environmental baseline and cumulative effects, would avoid jeopardizing the species. Because NMFS found these alternatives insufficient, it then assessed whether the added impact of off-site mitigation

activities unrelated to FCRPS operations, including hatchery and habitat initiatives, would avoid jeopardy, and found that they would.

NWF filed an ESA challenge to the 2000 BiOp in the District of Oregon, initiating this litigation. In May 2003, the district court ruled that the 2000 BiOp was arbitrary and capricious because it relied on (1) federal mitigation actions that had not been subject to Section 7 consultation and (2) non-federal mitigation actions that had not been shown reasonably certain to occur. *NWF v. NMFS*, 254 F. Supp. 2d 1196, 1213 (D. Or. 2003). The court remanded to the agencies for a new BiOp and revisions to the proposed operations, leaving the 2000 BiOp in effect in the meantime.

On remand, NMFS made several structural changes to its jeopardy analysis. The 2004 BiOp's jeopardy analysis included in the environmental baseline for the proposed action the existing FCRPS, various supposedly nondiscretionary dam operations, and all past and present impacts from discretionary operations. NMFS also adopted a novel "reference operation" approach in the 2004 BiOp, purportedly in order to account for the existence of the FCRPS dams. The reference operation consisted of the dams and a hypothetical regime for operating them, which, according to NMFS, was the most beneficial to listed fishes of any possible operating regime. NMFS also found, though, that certain aspects of FCRPS operations — such as operations relating to irrigation, flood control, and power generation — were nondiscretionary, given the dams' existence, and that those aspects should not be considered part of the action under ESA review. The BiOp offers little detail on the nature and extent of the purportedly nondiscretionary obligations or NMFS's basis for finding them to be nondiscretionary.

Also, instead of assessing whether the listed fish would be jeopardized by the aggregate of the proposed agency action, the environmental baseline, cumulative effects, and current

status of the species, NMFS segregated its analysis, first evaluating whether the proposed agency action — consisting of only the proposed discretionary operation of the FCRPS — would have an appreciable net effect on a species. It considered additional context only if it found such an effect. By using this so-called comparative approach rather than a more holistic, aggregate approach, NMFS concluded that the proposed action would not jeopardize the continued existence of the listed fish. Although the 2004 BiOp did not point to any improvement in the fishes' status or the impacts of FCRPS operations, its new approach attributed only a much smaller portion of the fishes' perilous condition to the proposed operations under review. The 2004 BiOp's jeopardy analysis also omitted any clear consideration of the impact of proposed operations on listed species' chances of recovery, which had been a prominent feature of earlier analyses.

On December 30, 2004, NWF filed a Second Supplemental Complaint against NMFS, challenging the new 2004 BiOp.[5] On May 26, 2005, the district court ruled on summary judgment motions filed by NWF, the State of Oregon (which intervened as a plaintiff), NMFS, and other parties. The court held the 2004 BiOp invalid on several grounds raised by NWF and declined to reach the various parties' other claims.

The district court concluded that there were several structural flaws with the 2004 BiOp's jeopardy analysis, as well as more modest defects in the BiOp's analysis of impacts on critical habitat. First, the court determined that the agencies had discretion to balance the FCRPS's various purposes to comply with ESA's requirements, and that the 2004 BiOp impermissibly used the "reference operation" to redefine most FCRPS ongoing operations as part of the "existence of the dams," instead of including those operations as part of the agency

---

[5]Three months later, NWF filed a Third Supplemental Complaint, adding claims against the Corps and Bureau of Reclamation that are not before us.

action under review. Also, the court held that the 2004 BiOp's new, two-stage comparative analysis did not satisfy NMFS's obligation to make its jeopardy determination based on the full natural and human context of the proposed action. The court also objected to the 2004 BiOp's complete omission of recovery needs from its jeopardy analysis. Finally, the court concluded that the 2004 BiOp did not adequately consider the recovery implications of the proposed operation's effects on designated critical habitat for three listed species.

On June 10, 2005, the district court granted in part NWF's motion for a preliminary injunction requiring NMFS to increase flow and spill at certain FCRPS dams during the summer of 2005. On review of that decision, we held that the district court had not abused its discretion in granting NWF a preliminary injunction, but remanded to the district court "the question of whether the injunction should be more narrowly tailored or modified." *NWF*, 422 F.3d at 800.

On September 26, 2005, the district court entered final judgment under Federal Rule of Civil Procedure 54(b), as to its May 2005 summary judgment decision on the merits of NWF's 2004 BiOp claims. The district court then remanded to NMFS for yet another revision of the BiOp, which was proceeding at the time of oral argument. Among other things, the remand order required NMFS to collaborate with interested states and tribes and to provide a "failure report" if the remand process appeared unlikely to produce a no-jeopardy finding within the court's remand timeframe. After the court amended its Rule 54(b) order on October 24, 2005, to include the October 10, 2005, remand order, NMFS appealed again. We consider here NMFS's challenges to the merits of the district court's May 2005 summary judgment decision, and to the novel elements of the remand order.[6]

---

[6]Other claims were raised on appeal by Columbia Snake River Irrigators Association and Eastern Oregon Irrigators Association, plaintiffs in a separate action below. We address those claims in a memorandum disposition in No. 05-35736 filed concurrently with this opinion.

We review the district court's decision and analysis de novo. We may affirm the district court's rejection of the 2004 BiOp, under the Administrative Procedure Act ("APA"), if the agency action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(a). Although we may not substitute our judgment for that of the agency, we must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it. *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005).

## II

After a careful review of the record, we conclude that the district court correctly determined that the jeopardy analysis of the 2004 BiOp contained structural flaws that rendered it incompatible with the ESA. Our conclusion is not altered by the Supreme Court's recent decision in *National Association of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518 (2007), which was filed after our opinion was published but before we received the petition for rehearing.[7] In *Home Builders*, the Supreme Court granted *Chevron* deference to the regulation which provides that Section 7 consultation applies "to all actions in which there is *discretionary* Federal involvement or control," 50 C.F.R. § 402.03 (emphasis added). 127 S. Ct. at 2534-35. The Court interpreted the regulation as clarifying that Section 7 "covers only discretionary agency actions and does not attach to actions . . . that an agency is *required* by statute to undertake once certain specified triggering events have occurred. *Id.* at 2536 (emphasis in original). The Court found the regulation to be a reasonable resolution to the problem of an agency being unable to "simultaneously

---

[7]A petition for rehearing was filed by the State of Idaho and a response to the petition for rehearing was filed by the National Wildlife Federation. Although the federal appellants requested, and received, an extension to file petitions for rehearing, no such petition(s) were filed.

obey" both Section 7 and a separate statute which expressly requires an agency to take a conflicting action. *Id.* at 2533-34. We do not face this problem here, however, because in the present case Congress has imposed broad mandates, rather than directing the agency to take specific actions, and the agencies are perfectly capable of simultaneously obeying Section 7 and those mandates.

A

**[1]** The district court properly held that NMFS may not use a hypothetical "reference operation" in its jeopardy analysis to exclude from the proposed actions' impacts the effects of related operations NMFS deems "nondiscretionary." NMFS admits that it chose the reference operation approach in order to avoid "trying to precisely determine the extent of the Action Agencies' discretionary operation." However, neither the ESA nor *Home Builders* permits agencies to ignore potential jeopardy risks by labeling parts of an action nondiscretionary. We cannot approve NMFS's interpretation of this rule as excluding from the agency action under review discretionary agency actions taken pursuant to a broad congressional mandate.

**[2]** First, we note that federal agencies, including NMFS, have not previously taken such a cramped view of § 402.03's reference to "discretionary" federal action. Indeed, such an approach is a drastic change from NMFS's own approach in the 1995 and 2000 BiOps. Because NMFS's approach is a novel one, completely at odds with NMFS's prior scientific approaches, it merits little deference. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference . . . .") (internal quotation marks omitted).

**[3]** Second, NMFS's contention that competing mandates for flood control, irrigation, and power production create any

immutable obligations that fall outside of agency discretion is not persuasive. Indeed, NMFS's interpretation is neither mandated nor intimated by the Court's holding in *Home Builders*. The Court's concern in *Home Builders* was that "[a]n agency cannot simultaneously obey the differing mandates set forth in § 7(a)(2) of the ESA and § 402(b) of the CWA." 127 S. Ct. at 2534. In this context, compliance with the CWA provision is problematic because the provision "affirmatively mandates that [a specific action which conflicts with the ESA] 'shall' be [taken] if the specified criteria are met. The provision operates as a ceiling as well as a floor." *Id.* at 2533. Here, in contrast, Congress has imposed broad mandates which do not direct agencies to perform any specific nondiscretionary actions, but rather, are better characterized as directing the agencies to achieve particular goals.

The 2004 BiOp itself recognizes that Congress has not quantified any of those broad goals, or otherwise specified the manner in which the agencies must fulfill them. NMFS found, for instance, that Congress has mandated that dam operations include flood control, though "Congress has not prescribed precisely how the Corps must achieve its flood control responsibilities." 2004 BiOp at 5-5. Similarly, Congress has mandated that the BPA market and transmit "some level of power, although the precise level is not defined." *Id.* Thus, the 2004 BiOp recognizes that Congress has not specified the manner in which the agencies must fulfill their various obligations. In other words, while the goals themselves may be mandatory, the agencies retain considerable discretion in choosing what specific actions to take in order to implement them. The agencies are therefore obligated to satisfy the ESA's requirements. *See Pac. Coast Fed'n*, 426 F.3d at 1084-85 ("The ESA obligates federal agencies 'to afford first priority to the declared national policy of saving endangered species.' ") (quoting *TVA v. Hill*, 437 U.S. 153, 185 (1978)).[8]

---

[8]Moreover, at least some of the competing statutory mandates clearly acknowledge that implementing agencies must accommodate wildlife

NMFS may not avoid determining the limits of the action agencies' discretion by using a reference operation to sweep so-called "nondiscretionary" operations into the environmental baseline, thereby excluding them from the requisite ESA jeopardy analysis. And *Home Builders* cannot be read, as the State of Idaho would have us do, to immunize discretionary agency actions simply because they are taken in pursuit of a non-discretionary goal. The concern that an agency cannot "simultaneously obey" with both the ESA and the broad mandates relevant to this case is simply not at issue here.

**[4]** ESA compliance is not optional. "[A]n agency cannot escape its obligation to comply with the ESA merely because it is bound to comply with another statute that has consistent, complementary objectives." *Washington Toxics Coal. v. EPA*, 413 F.3d 1024, 1032 (9th Cir. 2005). As the Court emphasized in *Home Builders*, "ESA's no-jeopardy mandate applies to every discretionary agency action—regardless of the expense or burden its application might impose." 127 S. Ct. at 2537. When an agency, acting in furtherance of a broad Congressional mandate, chooses a course of action which is not specifically mandated by Congress and which is not specifically necessitated by the broad mandate, that action is, by definition, discretionary and is thus subject to Section 7 consultation. Because NMFS's approach in the 2004 BiOp produces the opposite result, it is inconsistent with the ESA and its accompanying regulations, and cannot stand.

---

needs. *See* Northwest Power Act, 16 U.S.C. § 839 (providing for purposes of 1980 Pacific Northwest Electric Power Planning and Conservation Act "to be construed in a manner consistent with applicable environmental laws"); *ALCOA*, 175 F.3d at 1163 ("The Northwest Power Act's goal of providing economical power, however, does not supplant the BPS's obligation to comply with environmental mandates."); *Confederated Tribes & Bands of the Yakima Indian Nation v. FERC*, 746 F.2d 466, 473 (9th Cir. 1984) (finding Northwest Power Act places "fish and wildlife concerns on an equal footing with power production").

B

**[5]** The district court also properly concluded that the 2004 BiOp impermissibly failed to incorporate degraded baseline conditions into its jeopardy analysis. The 2004 BiOp initially evaluated the effects of the proposed action as compared to the reference operation, rather than focusing its analysis on whether the action effects, when added to the underlying baseline conditions, would tip the species into jeopardy. Like the district court, we cannot approve NMFS's insistence that it may conduct the bulk of its jeopardy analysis in a vacuum.

**[6]** To "jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 CFR § 402.02; 16 U.S.C. § 1536(a)(2). NMFS argues that, under this definition, it may satisfy the ESA by comparing the effects of proposed FCRPS operations on listed species to the risk posed by baseline conditions. Only if those effects are "appreciably" worse than baseline conditions must a full jeopardy analysis be made. Under this approach, a listed species could be gradually destroyed, so long as each step on the path to destruction is sufficiently modest. This type of slow slide into oblivion is one of the very ills the ESA seeks to prevent.

**[7]** Requiring NMFS to consider the proposed FCRPS operations in their actual context does not, as NMFS argues, effectively expand the "agency action" at issue to include all independent or baseline harms to listed species. Nor does it have the effect of preventing any federal action once background conditions place a species in jeopardy. To "jeopardize" — the action ESA prohibits — means to "expose to loss or injury" or to "imperil." Either of these implies causation, and thus some new risk of harm. Likewise, the suffix "-ize" in "jeopardize" indicates some active change of status: an

agency may not "cause [a species] to be or to become" in a state of jeopardy or "subject [a species] to" jeopardy. American Heritage Dictionary of the English Language (4th ed.). Agency action can only "jeopardize" a species' existence if that agency action causes some deterioration in the species' pre-action condition.

Even under the so-called aggregation approach NMFS challenges, then, an agency only "jeopardize[s]" a species if it causes some new jeopardy. An agency may still take action that removes a species from jeopardy entirely, or that lessens the degree of jeopardy. However, an agency may not take action that will tip a species from a state of precarious survival into a state of likely extinction. Likewise, even where baseline conditions already jeopardize a species, an agency may not take action that deepens the jeopardy by causing additional harm.

[8] Our approach does not require NMFS to include the entire environmental baseline in the "agency action" subject to review.[9] It simply requires that NMFS appropriately consider the effects of its actions "within the context of other existing human activities that impact the listed species." *ALCOA*, 175 F.3d at 1162 n.6 (citing 50 C.F.R. § 402.02's definition of the environmental baseline). This approach is consistent with our instruction (which NMFS does not challenge) that "[t]he proper baseline analysis is not the proportional share of responsibility the federal agency bears for the decline in the species, but what jeopardy might result from the agency's proposed actions *in the present and future human and natural contexts*." *Pac. Coast Fed'n*, 426 F.3d at 1093 (emphasis added).

---

[9]We note that under NMFS's jeopardy approach, the environmental baseline serves only as a point of reference to determine the net effects of a narrowly-defined action. Thus, whether an action is included in the baseline determines whether its impacts are considered at all in the agency's basic jeopardy analysis.

**[9]** The current existence of the FCRPS dams constitutes an "existing human activity" which is already endangering the fishes' survival and recovery. *See ALCOA*, 175 F.3d at 1162 n.6 (citing 50 C.F.R. § 402.02). Although we acknowledge that the existence of the dams must be included in the environmental baseline, the operation of the dams is within the federal agencies' discretion under both the ESA and the Northwest Power Act, 16 U.S.C. § 839. Any proposed agency action must be evaluated in the contest of this baseline in order to properly determine whether the proposed actions will jeopardize the listed fishes.

## C

**[10]** The district court also properly concluded that the 2004 BiOp was legally deficient because its jeopardy analysis did not adequately consider the proposed actions' impacts on the listed species' chances of recovery. ESA prohibits agency action that is "likely to jeopardize the continued existence of" any listed species. 16 U.S.C. § 1536(a)(2). The regulations interpret this to prohibit any agency action "that reasonably would be expected, directly or indirectly, *to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild*." 50 CFR § 402.02 (emphasis added).

NMFS contends that this restriction bars only actions that will both (1) reduce appreciably the likelihood of survival and (2) reduce appreciably the likelihood of recovery, and that its views are entitled to deference under *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). Under this interpretation, though, NMFS need only consider effects on survival: if there is no appreciable reduction of survival odds, there can never be jeopardy, even if recovery is completely impossible. Because a species can often cling to survival even when recovery is far out of reach, NMFS's interpretation of the jeopardy regulation reads "and recovery" entirely out of the text. This disregard for the statutory and regulatory context deserves no deference.

Although we "will generally afford deference to the agency's construction of its own regulation," this deference is not absolute. *Regents of Univ. of Cal. v. Shalala*, 82 F.3d 291, 294 (9th Cir. 1996); *see also Webber v. Crabtree*, 158 F.3d 460, 461 (9th Cir. 1998) ("Although we accord a high degree of deference to an agency's interpretation of its own regulation, that interpretation cannot be upheld if it is plainly erroneous or inconsistent with the regulation."). Rather, the court conducts a "two-pronged analysis." *Shalala*, 82 F.3d at 294. First, considering the "plain language of the regulation," we must inquire whether "[t]he words of the regulation [are] reasonably susceptible to the construction placed upon them [by the agency], both on their face and in light of their prior interpretation and application." *Id.* (internal quotation marks omitted). Second, we review the agency's construction "in relation to the governing statute," to determine whether it is "consistent with and in furtherance of the purposes and policies embodied in the Congressional statute" authorizing the regulation. *Id.* NMFS's interpretation of the jeopardy regulation fails at both stages.

[11] As in *Gifford Pinchot Task Force v. United States Fish & Wildlife Service*, 378 F.3d 1059 (9th Cir. 2004), we conclude that the jeopardy regulation requires NMFS to consider both recovery and survival impacts. *Gifford Pinchot* held that NMFS was required to consider recovery as well as survival impacts in evaluating adverse modification of critical habitat, rejecting the agency's narrow interpretation of regulatory language identical to that presented here. Specifically, we held that "[b]ecause it is logical and inevitable that a species requires more critical habitat for recovery than is necessary for the species survival, the regulation's singular focus becomes 'survival.'" *Gifford Pinchot*, 378 F.3d at 1069. Concluding that ESA's critical habitat provisions required protection — and thus agency consideration — of both survival and recovery needs, we held that the regulation's "singular focus" on survival violated the ESA. *Id.* at 1070.

We need not consider whether the ESA itself requires NMFS to consider both survival and recovery (as *Gifford Pinchot* held was the case for critical habitat), because we conclude that the text of the jeopardy regulation is not "reasonably susceptible" to the "survival only" interpretation NMFS now gives it. As a general rule applicable to both statutes and regulations, textual interpretations that give no significance to portions of the text are disfavored. *Hart v. McLucas*, 535 F.2d 516, 519 (9th Cir. 1979). NMFS's reading of the jeopardy regulation inexplicably reads "and recovery" out of the text. Also, NMFS's interpretation is unreasonable "in light of [the regulation's] prior interpretation and application." *See Shalala*, 82 F.3d at 294 (internal quotation marks omitted). Until issuing the 2004 BiOp, the agency had consistently interpreted 50 C.F.R. § 402.02 as requiring a joint analysis of both survival and recovery impacts. Nothing in its prior approach indicates that NMFS may simply avoid any consideration of recovery impacts, as it admits it has done here.[10]

When the regulation was issued in its current form, in June 1986, the preamble and comments on the revised regulations offered a reasonable explanation for the regulation's use of the phrase "reduce appreciably the likelihood of both the survival and recovery of a listed species." 51 Fed. Reg. 19,934 (June 3, 1986). The comments noted that there was some controversy over the reference to "both the survival and recovery," but explained that the standard referred to a "*joint* survival and recovery concept." *Id.* (emphasis added). The 1986 revisions added the word "both" "to emphasize that, *except in exceptional circumstances*, injury to recovery alone would not warrant [a jeopardy finding]." *Id.* (emphasis

---

[10]Although the 2004 BiOp does not discuss recovery, NMFS argues that it "implicitly" analyzed recovery in its survival analysis. However, we may not consider this post hoc justification, or infer "an analysis that is not shown in the record." *Gifford Pinchot*, 278 F.3d at 1074; *see also Pac. Coast Fed'n*, 426 F.3d at 1091 ("[W]e cannot infer an agency's reasoning from mere silence," and "an agency's action must be upheld, if at all, on the basis articulated by the agency.") (internal quotation marks omitted).

added). Thus, "in exceptional circumstances," injury to recovery prospects alone could result in a jeopardy finding. The comments expressly acknowledged that "significant impairment of recovery efforts or other adverse effects [besides survival impacts] which rise to the level of 'jeopardizing' the 'continued existence' of a listed species can also be the basis for issuing a 'jeopardy' opinion." *Id.* In order to recognize such effects, and to apply the proper "joint survival and recovery concept," NMFS must analyze effects on recovery as well as effects on survival.[11]

We also note that this view of survival and recovery, as intertwined needs that must both be considered in a jeopardy analysis, is consistent with NMFS's jeopardy analysis in earlier BiOps, particularly the 1995 and 2000 BiOps in this very dispute. Those BiOps plainly considered analysis of the listed species' prospects for recovery as essential to the jeopardy analysis, and included repeated reference to, and measurement of, the relevant species' chances to survive proposed operations "with an adequate potential for recovery." NMFS has offered no rational explanation for its sudden decision to omit recovery needs from the 2004 BiOp's analysis. Because the agency has so dramatically changed its approach, its new interpretation is entitled to less deference than we might usually give. *Cardoza-Fonseca*, 480 U.S. at 446 n.30.

[12] The question before us is not whether, on the merits, recovery risks in fact require a jeopardy finding here, but whether, as part of the consultation process, NMFS must conduct a full analysis of those risks and their impacts on the listed species' continued existence. Although recovery impacts alone may not *often* prompt a jeopardy finding,

---

[11]We recognize that "these concepts [survival and recovery] are generally considered together in analyzing effects, and it is difficult to draw clear-cut distinctions." 51 Fed. Reg. 19,934. However, the agency may not resolve this difficulty by ignoring recovery needs and focusing entirely on survival, as it has claimed the right to do here.

NMFS's analytical omission here may not be dismissed as harmless: the highly precarious status of the listed fishes at issue raises a substantial possibility that considering recovery impacts could change the jeopardy analysis.[12] The only reasonable interpretation of the jeopardy regulation requires NMFS to consider recovery impacts as well as survival.

D

**[13]** In sum, the district court correctly held that the 2004 BiOp's analysis was structurally flawed. It properly determined that the agency may not use a hypothetical "reference operation" in its jeopardy analysis to exclude from the proposed action's impacts the effects of related operations the agency deems "nondiscretionary." The district court also properly concluded that the 2004 BiOp impermissibly failed to incorporate degraded baseline conditions into its jeopardy analysis. Finally, the district court correctly determined that the 2004 BiOp was legally deficient because its jeopardy analysis did not adequately consider the proposed action's impacts on the listed species' chances of recovery.

At its core, the 2004 BiOp amounted to little more than an analytical slight of hand, manipulating the variables to achieve a "no jeopardy" finding. Statistically speaking, using the 2004 BiOp's analytical framework, the dead fish were really alive. The ESA requires a more realistic, common sense examination. For these reasons, the district court's rejection of the 2004 BiOp's jeopardy analysis was entirely correct.

III

**[14]** The district court properly held that NMFS violated the ESA by failing to ensure that proposed FCRPS operations

---

[12]We note, for example, the 2004 BiOp's statement that the Snake River sockeye's continued near-total dependence on hatchery programs for survival may seriously harm its chances of recovery.

would not destroy or adversely modify critical habitat for any listed fish. Specifically, the district court found inadequate NMFS's analysis of impacts on the recovery value of critical habitat for Snake River Spring/Summer Chinook salmon, Snake River Fall Chinook salmon, and Snake River sockeye salmon, the only three listed species with designated critical habitat at the time the 2004 BiOp was issued.[13]

[15] The ESA mandates that federal agencies take no action that will result in the "destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). "Destruction or adverse modification" is defined as follows:

> a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical.

50 C.F.R. § 402.02. This regulation, as interpreted by NMFS, "reads the 'recovery' goal out of the adverse modification inquiry," and requires agencies to consider alterations that appreciably diminish the value of critical habitat for *either* survival or recovery. *Gifford Pinchot*, 378 F.3d at 1069.

The 2004 BiOp used two different methods to evaluate critical habitat impacts, apparently due to post-*Gifford Pinchot* uncertainty, and found no adverse modification under either method. The first method, the "Environmental Baseline Approach," used the BiOp's environmental baseline[14] as a reference point. This method considers first whether "the pro-

---

[13]Critical habitat designations for nine other listed species were withdrawn after a successful 2002 court challenge.

[14]This indirectly raises the same baseline-definition problems addressed above.

posed action is likely to alter an essential feature of the critical habitat compared to the condition under the environmental baseline," and, if it does, "whether that alteration appreciably diminishes the value of critical habitat for survival or recovery." As an alternative, NMFS also used a "Listing Conditions Approach," which is similar, but uses as a reference point habitat conditions at the time the species was listed. Because the "Listing Conditions" approach clearly does not satisfy ESA, we consider only the "Environmental Baseline" approach in any detail.[15]

**[16]** We agree with the district court that NMFS's adverse modification analysis did not adequately consider recovery needs and was therefore deficient under *Gifford Pinchot,* 378 F.3d at 1069. We agree with the district court that NMFS's critical habitat determination was arbitrary and capricious because it (1) did not adequately consider the proposed action's short-term negative effects in the context of the affected species' life cycles and migration patterns, (2) relied on uncertain long-term improvements to critical habitat to offset certain short-term degradation, and (3) concluded that the species' critical habitat was sufficient for recovery without adequate information to make that determination.

## A

**[17]** The 2004 BiOp disregarded our clear instruction that NMFS "must consider near-term habitat loss to populations

---

[15]Not surprisingly, the Listing Conditions approach found no hint of a problem with any of the proposed action. The Listing Conditions approach is entirely divorced from the statutory instruction to avoid "adverse modification," 16 U.S.C. § 1536(a)(2), importing a reference point that is incompatible with the statute's plain language and clear purpose of improving endangered species' condition over time. Nothing in the statute's language or purpose supports NMFS's chosen meaning of "adverse modification below conditions existing at time of listing." Neither "adverse" nor "modification" ordinarily implies measurement against conditions at some remote point in the past.

with short life cycles." *Pac. Coast Fed'n*, 426 F.3d at 1094 (rejecting agency's no-jeopardy finding for failure to provide adequate, reasoned analysis of short-term impacts on endangered coho salmon). As we noted there, "[i]t is not enough to provide water for [endangered fish] to survive in five years, if in the meantime, the population has been weakened or destroyed by inadequate water flows." *Id.* at 1095. Here, the 2004 BiOp explicitly found that the proposed FCRPS operations would have significant negative impacts on each affected species' critical habitat through 2010, in spite of planned mitigation efforts. However, it did not adequately demonstrate that these impacts would not affect the fishes' survival and recovery, in light of their short life-cycles and current extremely poor habitat conditions.[16]

First, for the Snake River Spring/Summer Chinook, NMFS found that the proposed action would have a significant negative impact on "the essential habitat feature of safe passage in the juvenile migration corridor" for five years, despite mitigation efforts. In spite of this, NMFS found no adverse modification for the Spring/Summer Chinook "based primarily on the determination that, by the sixth year of this proposed action, the condition of critical habitat in the juvenile migration corridor would be improved." In other words, NMFS found that there was no adverse modification because it ignored the short-term adverse modification and considered only long-term impacts. This does not satisfy ESA's requirements. *See Gifford Pinchot*, 378 F.3d at 1069.

Effects on Snake River sockeye are both more uncertain and likely more severe. NMFS found that Snake River sockeye will also suffer "significant" impairment of the safe passage feature of critical habitat between 2004 and 2009, and

---

[16]As in *Pacific Coast Federation*, we cannot simply take the agency's word that the listed species will be protected under the planned operations: "If this were sufficient, the NMFS could simply assert that its decisions were protective and so withstand all scrutiny." 426 F.3d at 1092.

lower survival for the entire duration of the proposed action. As with the Snake River Spring/Fall Chinook, despite the current "extremely poor" habitat conditions, NMFS found no adverse modification of sockeye habitat based mainly on its conclusion that, by the sixth year of proposed operations, habitat quality would be either unchanged or reduced by an amount not considered "appreciable." This also fails to satisfy our rule in *Gifford Pinchot*.

In addition, NMFS relied heavily on the fact that "almost all" of the Snake River sockeye found in the FCRPS today are hatchery fish, and that hatchery operations could replace fish lost under the proposed FCRPS operation. At the same time, NMFS explicitly found that continued reliance on the hatchery operation itself threatens the sockeyes' chances of recovery: "The longer this ESU relies on the captive broodstock program for its existence, the greater the risks associated with domestication and loss of genetic diversity, which will increase the difficulty of reestablishing a viable population in the ESU's native habitat." However, NMFS's adverse modification analysis failed to consider the impact of prolonging the sockeyes' hatchery dependence on its eventual prospects for recovery.

B

**[18]** To the extent that NMFS found habitat conditions would improve during the 2010-2014 period of operations, it relied significantly on future installation of Removable Spillway Weirs (a type of surface bypass collector) and other structural improvements to aid safe passage. We agree with the district court that such improvements may not be included as part of the proposed action without more solid guarantees that they will actually occur. Although NMFS maintains that "[t]he agencies are committed to installation of surface bypass collectors at all dams where feasible, as exemplified by the recent installation of such structures at three dams," we are not persuaded that even a sincere general commitment to

future improvements may be included in the proposed action in order to offset its certain immediate negative effects, absent specific and binding plans. Although the record does reflect a general desire to install structural improvements where feasible, it does not show a clear, definite commitment of resources for future improvements.[17] Also, while some structural improvements have already been made, these may neither substitute for nor guarantee the future improvements that NMFS found would improve fish habitat starting from 2010 through 2014.

C

[19] The district court correctly held that NMFS inappropriately evaluated recovery impacts without knowing the in-river survival levels necessary to support recovery. It is only logical to require that the agency know roughly at what point survival and recovery will be placed at risk before it may conclude that no harm will result from "significant" impairments to habitat that is already severely degraded. Requiring some attention to recovery issues does not improperly import ESA's separate recovery planning provisions into the section 7 consultation process. Rather, it simply provides some reasonable assurance that the agency action in question will not appreciably reduce the odds of success for future recovery planning, by tipping a listed species too far into danger.

IV

Finally, NMFS contends that the district court's October 7, 2005, remand order exceeded the scope of its authority. Specifically, NMFS challenges the remand order's requirements that NMFS provide a "failure report" to the district court if it

---

[17]It may well be that the agencies lack the power to guarantee the improvements in question. However, if this is the case, the proper course is to exclude them from the analysis and consider only those actions that are in fact under agency control or otherwise reasonably certain to occur.

believes the agencies will be unable to develop a proposed action that avoids jeopardy to listed fish within the district court's remand timeframe, and that the agency consult with interested tribes and states during the remand. We have jurisdiction over this challenge because the remand order is included in the district court's amended final judgment under Rule 54(b) entered on October 24, 2005. "The district court has broad latitude in fashioning equitable relief when necessary to remedy an established wrong," *Alaska Ctr. for the Env't v. Browner* ("*ACE*"), 20 F.3d 981, 986 (9th Cir. 1994), and we review the district court's choice of remedies within that scope for abuse of discretion, *United States v. Alisal Water Corp.*, 431 F.3d 643, 654 (9th Cir. 2005). We conclude that the disputed portions of the remand order are within the district court's authority, so long as they are enforced as written, and not as a broader license to direct the remand proceedings.

The "failure report" requirement falls within the district court's power. The remand order's precise command is as follows:

> If, at any time during the remand period, NOAA concludes the Action Agencies are not making sufficient progress in developing a proposed action and/or RPA that avoids jeopardy to the listed species, NOAA shall advise the court of that circumstance immediately and shall issue a 'failure report' similar to that required in the 2000 BiOp, that advises the court and the parties of those additional measures, including the breaching of dams, that may be necessary to achieve a valid no-jeopardy finding.

NMFS does not challenge the district court's requirement of regular status reports every 90 days during the remand, and such reporting requirements are clearly permissible. *See Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 81 (D.C. Cir. 1984). Nor does NMFS challenge the court's dis-

cretionary authority to impose a deadline for the remand proceedings. *See Nat'l Org. of Veterans' Advocates v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1381 (Fed. Cir. 2001) (setting 120-day deadline for rule-making). The "failure report" requirement here is a reasonable combination of a time limit and progress reports and is appropriate under the circumstances of this case. The district court reasonably found that such specific direction was necessary in light of the agency's conduct on earlier remands and the urgency of the listed species' situation.

The other requirement NMFS challenges is this:

> During the remand period, [the agencies] shall collaborate with the sovereign entities, including the States of Idaho, Montana, Oregon, and Washington, and the Tribes who are parties or *amici* in the action . . . to achieve the goals of:

> (a)   Developing items to be included in the proposed action; and

> (b)   Clarifying policy issues and reaching agreement or narrowing the areas of disagreement on scientific and technical information.

This collaboration requirement is justified both as a reasonable means to ensure that NMFS complies with ESA's mandate that agencies "use the best scientific and commercial data available" in their decision-making, 16 U.S.C. § 1536(a)(2), and as a reasonable procedural restriction given the history of the litigation. However, we note that the requirement does not on its face direct the substance of the agencies' actions on remand, and may not be interpreted to do so.

Courts may, at least in some circumstances, require specific actions from an agency on remand. In *ACE*, 20 F.3d at 986-87, which addressed the EPA's persistent failure to establish

total maximum daily loads for Alaskan waters as required by the CWA, we approved significant, but carefully tailored, control of the EPA's proceedings on remand. We held that "[i]n tailoring the relief granted, the district court correctly recognized that in order to bring about any progress toward achieving the congressional objectives of the CWA, the EPA would have to be directed to take specific steps." *Id.* at 986. Such discretion is also necessary here.

Of course, there are also limits to the courts' power to control an agency's conduct on remand. *See FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S 326, 333 (1976) (finding that the court of appeals had "overstepped the bounds of its reviewing authority" by ordering a direct evidentiary report to the court). In *ACE*, we noted with approval that "the [district] court was careful to leave the substance and manner of achieving [CWA] compliance entirely to the EPA." *ACE*, 20 F.3d at 986-87. Thus, the district court's remedy fell within its "traditional, equitable, and interstitial role to fashion [a] remedy" for the agencies' dereliction of their statutory duties. *Id.* at 987.

**[20]** Here, FCRPS operations have been the subject of perpetual litigation since the fish in question were first listed in the early 1990s. The analytical approach of the 2004 BiOp, issued under court order after a remand in 2003, broke sharply from NMFS's previous analyses in the 1995 and 2000 BiOps, and did so in ways that lacked any reasonable foundation in ESA's statutory mandates. We hold that on this record, requiring consultation with states and tribes constitutes a permissible procedural restriction rather than an impermissible substantive restraint.[18] The district court's chosen remedy was "reasonably calculated to remedy an established wrong," and was not an abuse of discretion. *NRDC v. Sw. Marine, Inc.*,

---

[18]We find far less intrusion into agency procedures here than in the situation the Second Circuit found impermissible in *Sierra Club v. United States Army Corps of Engineers*, 701 F.2d 1011 (2d Cir. 1983).

236 F.3d 985, 1000 (9th Cir. 2000) (internal quotation marks omitted) (approving remedy to enforce compliance with CWA permit issued by agency, and finding no encroachment on agency's authority).

## V

In short, after a careful review of the record, we affirm the judgment of the district court. Its rejection of the 2004 BiOp was entirely appropriate, and it did not abuse its discretion in entering the remand order.

**AFFIRMED.**