**SALMON SPAWNING & RECOVERY ALLIANCE, Plaintiff,**

and

**Wild Fish Conservancy, formerly known as Washington Trout; Native Fish Society; Clark–Skamania Flyfishers, Plaintiffs—Appellants,**

v.

**NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION'S NATIONAL MARINE FISHERIES SERVICE; D. Robert Lohn, Region-**

---

** This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36–3.

al Administrator, National Oceanic and Atmospheric Administration's National Marine Fisheries Service; United States Department of Commerce; Carlos M. Gutierrez Secretary, United States Department of Commerce; United States Fish & Wildlife Service; Ren R. Lohoefener, Regional Director, United States Fish & Wildlife Service, Pacific Region; United States Department of the Interior; Dirk Kempthorne, Secretary, United States Department of the Interior, Defendants—Appellees.

No. 08–35439.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 10, 2009.

Filed Aug. 14, 2009.

Eric Redman, Esquire, Heller Ehrman, LLP, Svend A. Brandt–Erichsen, Esquire, Marten Law Group PLLC, Seattle, WA, for Plaintiffs–Appellants.

Ellen J. Durkee, Mark R. Haag, Esquire, U.S. Department of Justice, Washington, DC, Carter Howell, Esquire, Office of the U.S. Attorney, Portland, OR, Bridg-

338

et McNeil, U.S. Department of Justice, Denver, CO, for Defendants–Appellees.

Before: HALL, O'SCANNLAIN, and BERZON, Circuit Judges.

## MEMORANDUM *

Wild Fish Conservancy and related plaintiffs (collectively, the "Conservation Groups") appeal from the district court's grant of summary judgment to the National Oceanic and Atmospheric Administration's National Marine Fisheries Service ("NMFS"). The facts are known to the parties and need not be repeated here, except as necessary to explain our decision.

We are not allowed to "substitute [our] judgment for that of the agency," *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and may only set aside the actions of NMFS in this case if they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *The Lands Council v. McNair,* .537 F.3d 981, 987 (9th Cir.2008) (en banc) ("[A] decision [i]s arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise." (internal quotation marks and citation omitted)).

NMFS was required to perform two related actions in this case: it was asked to approve or deny a resource management plan ("RMP"), and it was asked to draft a biological opinion ("BiOp"). In both cases, NMFS's determination rested on whether or not implementation of the RMP would "appreciably reduce the likelihood of survival and recovery" of the Puget Sound Chinook salmon. 50 C.F.R. § 223.203(b)(6)(iv); *id.* § 402.02.

▮ The Conservation Groups assert that NMFS did not properly factor "recovery" into its analysis. We disagree. While *National Wildlife Federation v. National Marine Fisheries Service,* 524 F.3d 917, 931–33 (9th Cir.2008), precluded NMFS from "simply avoid[ing] any consideration of recovery impacts," *id.* at 932, it was careful not to require NMFS to "import ESA's separate recovery planning provisions into the section 7 consultation process," *id.* at 936. Attention to recovery "simply provides some reasonable assurance that the agency action in question will not appreciably reduce the odds of success for future recovery planning, by tipping a listed species too far into danger." *Id.* Ultimately, the RMP need not boost the Chinook's chances of recovery; NMFS must only determine those chances are not "appreciably" diminished by the plan. *See id.* at 930 ("Agency action can only 'jeopardize' a species existence if that agency action causes some deterioration in the species' pre-action condition.").

▮ Here, we conclude that NMFS employed "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), and correctly interpreted 50 C.F.R.

---

* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36–3.

§ 223.203(b) when it assessed the impact of the RMP on the recovery prospects of the Puget Sound Chinook ESU. Deciding how to assess, and indeed the assessment of, the impact of a RMP on an ESU's potential for recovery "involves a great deal of predictive judgment. Such judgments are entitled to particularly deferential review." *Trout Unlimited v. Lohn,* 559 F.3d 946, 959 (9th Cir.2009) (citing *The Lands Council,* 537 F.3d at 993). The conclusion NMFS reached in this case was that insofar as total recovery was unachievable under current habitat conditions, the RMP did not appreciably reduce the Chinook's chances of eventually reaching that goal. This conclusion—and the methods adopted to reach it—was reasonable and entitled to substantial deference. *See id.* at 959 (noting that we will not strike down agency action where "NMFS approached the ... decision in a thoughtful, comprehensive manner that balanced the agency's concerns and goals," and relied on an analysis of " 'substantial—though not dispositive—scientific data, and not on mere speculation' " (quoting *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1333 (9th Cir.1992))). We therefore decline to "second guess NMFS's resolution of [a] scientific question," *id.* at 956, in its area of "technical expertise," *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (internal quotation marks and citation omitted).[1]

Accordingly, the district court's grant of summary judgment to NMFS is

**AFFIRMED.**

---

1. This conclusion encompasses NMFS's approval of the exploitation rates in the Georgia Straight Region. NMFS's ultimate analysis was based on the recovery prospects of the ESU as a whole; not those of an isolated population. **ER 2:180–81.** While acknowledging that "any ESU-wide recovery scenario should include at least two to four ... popula-

BERZON, Circuit Judge, concurring in part and dissenting in part:

I agree with the government that the National Oceanic and Atmospheric Administration's National Marine Fisheries Service's ("NMFS") "current conditions" methodology was reasonable and is entitled to deference. I therefore concur in the majority disposition with the following exception:

I agree with the petitioners that NMFS acted arbitrarily and capriciously when it approved the planned exploitation rates for the Georgia Strait Region. In approving the Georgia Strait Region exploitation rate, the agency ignored the results of the methodology it otherwise vigorously defends and approved a harvesting rate inconsistent with its own analysis. Moreover, the reasons the agency provided for departing from its chosen analytic framework are speculative and not supported by evidence in the record or by a quantitative analysis. For these reasons, I would hold the agency's conclusion with respect to the Georgia Strait region arbitrary and capricious.

More specifically, the agency approved an exploitation rate for Nooksack salmon that is not only *not* "at or below" the benchmark rebuilding exploitation rate ("RER"), but is, in fact, *more than twice as high* than its derived rate. Further, when discussing the Nooksack River salmon population, the agency noted that, "Trends in escapement of natural-origin Nooksack early chinook salmon populations are increasing." By the agency's

---

tions in each of five geographic regions," NMFS also recognized that other factors, including "federal trust responsibilities to treaty Indian tribes [would] also be considered." **ER 2:181.** NMFS assessed these additional considerations when making its decision with respect to the Georgia Strait Region, and its conclusion is entitled to deference.

own reasoning, then, Nooksack River salmon production and viability are *not* primarily constrained by habitat conditions and *do* benefit from reduced harvesting. Yet, the agency reached the opposite conclusion, stating that "natural-origin recruitment [for Nooksack River salmon] will not increase much beyond [current] level[s] unless constraints limiting marine, freshwater, and estuary survival are alleviated."

The NMFS attempted to justify its departure from its own methodology by arguing that other factors will "adequately protect chinook salmon populations in the Georgia Straight Region." Contrary to the majority's conclusion, the justifications offered are not reasonable.

First, even if contributions from hatchery-origin spawners will "buffer" the adverse effects of the high exploitation rates, this justification cannot be squared with NMFS's repeated emphasis on maintaining the viability of the natural salmon population in each region. Second, the agency's argument that increasing natural-origin escapement trends justified a departure from its chosen methodology is at odds with its previous conclusion that the absence of increasing natural-origin escapement among other populations justified higher exploitation rates. The agency cannot rationally argue that both the absence and the presence of increasing natural-origin escapement justify higher harvesting rates. Third, the agency's suggestion that the Indian "tribes' expertise regarding the conservation of trust resources" will adequately protect the Nooksack River salmon is vague and could be used to justify a departure from the agency's chosen methodology across-the-board.

Fourth, and perhaps most importantly, the agency provides no quantitative support for the proposition that these other factors will compensate for the dangers posed by the high exploitation rates. This absence of quantitative analysis is particularly striking in light of the fact that the agency used complex data analysis techniques to derive the RERs and did not rely simply on speculation.

In sum, the reasons provided by NMFS for departing from its chosen methodology when it approved the proposed exploitation rates for the Georgia Strait region are both speculative and inconsistent with other aspects of the agency's approach to evaluating the harvest management plan. They do not justify the agency's decision to ignore the results of its own analysis. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (stating that an agency acts arbitrarily and capriciously when it "offer[s] an explanation for its decision that runs counter to the evidence before the agency.").

The majority suggests that the agency could reasonably approve exploitation rates for the Georgia Strait region that endangered the Nooksack River population so long as the heightened risk to the Nooksack River population did not threaten the viability of the Puget Sound chinook ESU as a whole. But the agency did not rely on this rationale when it approved the proposed Georgia Strait exploitation rates. Rather, under the agency's guidelines, the viability of the Nooksack River population is integral to an ESU-wide recovery. A reviewing court "must judge the propriety of [an agency] action solely by the grounds invoked by the agency" at the time the action was taken. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

Finally, the agency's consideration of federal trust responsibilities to treaty tribes does not support, as the majority maintains, the agency's decision to depart

from its chosen methodology and thereby endanger the Nooksack River Salmon population. To the contrary, the agency was required to consider its trust responsibilities when developing the methodology in the first instance. If NMFS's chosen methodology had failed to account for its trust responsibilities, the methodology itself would have been fatally flawed.

For all of the above reasons, I would hold that the agency acted arbitrarily and capriciously when it approved the Georgia Strait exploitation rate.