**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TULELAKE IRRIGATION
DISTRICT; KLAMATH WATER
USERS ASSOCIATION; TALLY
HO FARMS PARTNERSHIP,
DBA Walker Brothers; FOUR
H ORGANICS, LLC;
WOODHOUSE FARMING AND
SEED COMPANY; TULELAKE
GROWERS ASSOCIATION,
     *Plaintiffs-Appellants*,

v.

UNITED STATES FISH AND
WILDLIFE SERVICE, a federal
agency of the United States
Department of the Interior;
DEB HAALAND, in her official
capacity as Secretary of the
United States Department of
the Interior; AURELIA
SKIPWITH, in her official
capacity as Director of the
United States Fish and
Wildlife Service; PAUL
SOUZA, his official capacity
as Regional Director of the
United States Fish and

No. 20-35515

D.C. Nos.
1:17-cv-00069-CL
1:17-cv-00098-CL
1:17-cv-00468-CL
1:17-cv-00531-CL

OPINION

Wildlife Service, Pacific
Southwest Region,
         *Defendants-Appellees*,

AUDUBON SOCIETY OF
PORTLAND, An Oregon
nonprofit corporation;
OREGON WILD, An Oregon
nonprofit corporation;
WATERWATCH OF OREGON,
An Oregon nonprofit
corporation,
         *Intervenor-Defendants-
                  Appellees*.

Appeal from the United States District Court
for the District of Oregon
Michael J. McShane, District Judge, Presiding

Argued and Submitted October 5, 2021
Portland, Oregon

Filed July 18, 2022

Before:  William A. Fletcher, Sandra S. Ikuta, and
        Daniel A. Bress, Circuit Judges.

Opinion by Judge W. Fletcher

## SUMMARY[*]

### Environmental Law

The panel affirmed the district court's summary judgment to the U.S. Fish and Wildlife Service (the "Service") in an action brought by Tulelake Irrigation District and associated agricultural groups (collectively "TID") alleging that, in imposing restrictions on the agricultural uses of lease land in the Tule Lake and Lower Klamath Refuges in the Klamath Basin National Wildlife Refuge Complex in southern Oregon and northern California, the Service violated environmental laws.

On appeal, TID argued that the Service violated the Kuchel Act of 1964 and the National Wildlife Refuge System Improvement Act as amended by the Refuge Improvement Act ("Refuge Act").

First, TID argued that in approving the combined Environmental Impact Statement and Comprehensive Conservation Plan ("EIS/CCP") for five of the six wildlife refuges in the Klamath Refuge Complex, the Service misconstrued the Kuchel Act to require the Service to regulate uses of leased agricultural land in the two refuges to ensure that the uses were "consistent" with "proper wildfowl management." 16 U.S.C. § 695n. The panel rejected TID's interpretation of § 695n. The panel held that with respect to the textual argument made by TID, the language of § 695n, whether considered in isolation or in the context of the rest of

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the Kuchel Act, was unambiguous.  The panel held that it did not, therefore, need to proceed to step two of the *Chevron* analysis.  The panel concluded that the Kuchel Act required the Service to regulate the pattern of lease land agriculture in the refuges to ensure consistency with proper waterfowl management.

Second, TIL argued that agriculture was a "purpose," not a "use," of the Tule Lake and Lower Klamath Refuges, and that a compatibility determination by the Service was therefore not authorized under the Refuge Act.  The panel rejected TID's argument that agriculture was a coequal purpose rather than a "use" within the meaning of the Refuge Act.  With respect to the textual argument made by TID, the language of § 695*l* was unambiguous, making it unnecessary to proceed to step two of the *Chevron* analysis.  The panel held that the Refuge Act permitted agricultural "use" within the Klamath Refuge Complex only when the Service determines that it is "compatible with the major purposes" for which the area was established.

The panel held that under both the Kuchel and Refuge Acts the Service was required to ensure that agricultural use of leased land in the Lower Klamath and Tule Lake Refuges was "consistent" with (under the Kuchel Act) and "compatible" with (under the Refuge Act) "proper wildlife management."  The panel further held that the regulation in the EIS/CCP of agricultural uses of lease land was a proper exercise of the Service's authority under the Kuchel and Refuge Acts.

**COUNSEL**

Brittany K. Johnson (argued), Paul S. Simmons, and Alexis K. Stevens, Somach Simmons & Dunn, PC, Sacramento, California, for Plaintiffs-Appellants.

Andrew M. Bernie (argued), Andrew C. Mergen, and Ellen J. Durkee, Attorneys; Jean E. Williams, Acting Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

Maura C. Fahey (argued) and Oliver J. H. Stiefel, Crag Law Center, Portland, Oregon, for Intervenor-Defendants-Appellees.

Timothy Beau Ellis,Vial Fotheringham LLP, Lake Oswego, Oregon, for amici curiae Oregon Farm Bureau Federation, Klamath-Lake County Farm Bureau, California Farm Bureau Federation, Modoc County Farm Bureau, and Siskiyou County Farm Bureau.

**OPINION**

W. FLETCHER, Circuit Judge:

In January 2017, the United States Fish and Wildlife Service ("Service") issued a Record of Decision ("ROD") adopting a combined Environmental Impact Statement and a Comprehensive Conservation Plan ("EIS/CCP") for five of the six wildlife refuges in the Klamath Basin National Wildlife Refuge Complex ("Klamath Refuge Complex" or "Complex") in southern Oregon and northern California. This appeal is one of four consolidated appeals from a district court decision rejecting various challenges to the Service's action.

Tulelake Irrigation District and associated agricultural groups (collectively, "TID") have interests in leased agricultural land ("lease land") in the Tule Lake and Lower Klamath Refuges. In the appeal before us, TID brought suit in federal district court alleging that, in imposing restrictions on the agricultural uses of lease land in those refuges, the Service violated the Kuchel Act of 1964 ("Kuchel Act"), the National Wildlife Refuge System Improvement Act as amended by the Refuge Improvement Act ("Refuge Act"), the National Environmental Policy Act ("NEPA"), and the Clean Water Act ("CWA"). The district court granted summary judgment to the Service.

On appeal, TID argues only that the Service violated the Kuchel and Refuge Acts. TID argues that in approving the EIS/CCP the Service misconstrued the Kuchel Act to require the Service to regulate uses of leased agricultural land in the two refuges to ensure that the uses are "consistent" with "proper wildfowl management." 16 U.S.C. § 695n.

According to TID, the Kuchel Act does not authorize the Service to regulate uses of lease land to ensure such consistency.    TID further argues that the Service misconstrued the Refuge Act as requiring the Service to regulate uses of lease land to ensure that those uses are "compatible with the major purposes for which such [refuges] were established."  16 U.S.C. § 668dd(d)(1)(A).  TID argues that agriculture is a "purpose," not a "use," of the Tule Lake and Lower Klamath Refuges, and that a compatibility determination by the Service is therefore not authorized under the Refuge Act.

We affirm the district court.

## I.  Background

### A.  Statutory Background

The Klamath Refuge Complex is located in northern California and southern Oregon.  The Complex encompasses approximately 200,000 acres and consists of six separate national wildlife refuges:  the Tule Lake Refuge, the Lower Klamath Refuge, the Upper Klamath Refuge, the Clear Lake Refuge, the Klamath Marsh Refuge, and the Bear Valley Refuge.   The EIS/CCP describes the Complex as "internationally renowned for its great abundance and diversity of birdlife."   TID challenges restrictions in the EIS/CCP on agricultural uses of lease land in the Tule Lake and Lower Klamath Refuges.

The Kuchel Act, enacted in 1964, codified a compromise between wildlife conservation groups and agricultural interests.  The Act applies to four of the wildlife refuges in the Klamath Refuge Complex—the Tule Lake, Lower

Klamath, Upper Klamath, and Clear Lake Refuges. 16 U.S.C. § 695k. As relevant to this appeal, the Act provides:

> *Notwithstanding any other provisions of law*, all lands owned by the United States lying within the Executive order boundaries of the Tule Lake National Wildlife Refuge, the Lower Klamath National Wildlife Refuge, the Upper Klamath National Wildlife Refuge, and the Clear Lake Wildlife Refuge are hereby dedicated to wildlife conservation. *Such lands shall be administered by the Secretary of the Interior for the major purpose of waterfowl management, but with full consideration to optimum agricultural use that is consistent therewith.*

*Id.* § 695*l* (emphases added). The Act further provides:

> The Secretary shall, *consistent with proper waterfowl management*, continue the present pattern of leasing [specified] reserved lands . . . within the Executive order boundaries of the Lower Klamath and Tule Lake National Wildlife Refuges . . . .

*Id.* § 695n (emphasis added).

Two years after enacting the Kuchel Act, Congress enacted the National Wildlife Refuge System Administration Act of 1966—later amended in 1997 by the Refuge Improvement Act—to govern the entire National Wildlife Refuge System, including refuges in the Klamath Refuge

Complex.  We refer to the 1966 Act, together with the 1997 amendment, as the "Refuge Act."  The Refuge Act declares that "each refuge shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established."  16 U.S.C. § 668dd(a)(3)(A).  The Act defines the mission of the System as "administer[ing] a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States."  *Id.* § 668dd(a)(2).  The Act requires the Secretary of the Interior to "ensure that . . . the purposes of each refuge are carried out."  *Id.* § 668dd(a)(4)(D).  The Act authorizes the Secretary to "permit the *use* of any [refuge] . . . for any purpose . . . *whenever he determines that such uses are compatible with the major purposes for which such areas were established*."  *Id.* § 668dd(d)(1)(A) (emphases added).

The Refuge Act requires the Secretary to "propose a comprehensive conservation plan for each refuge or related complex of refuges"; "publish a notice of opportunity for public comment in the Federal Register on each proposed conservation plan"; "issue a final conservation plan for each planning unit consistent with the provisions of [the] Act"; and, "not less frequently than 15 years after the date of issuance of a conservation plan . . . and every 15 years thereafter, revise the conservation plan as may be necessary."  *Id.* § 668dd(e)(1)(A).  The challenged EIS/CCP was adopted by the Service pursuant to this requirement.

### B.  Factual Background

In the spring of 2010, the Service began the formal scoping process for the first ever Comprehensive

Conservation Plan for the Klamath Refuge Complex. In May 2016, the Service issued a draft CCP, accompanied by an EIS. After soliciting public comments to the draft, the Service filed the final joint EIS/CCP in December 2016. The Service issued the ROD in January 2017.

A CCP is "a programmatic document intended to analyze proposed management actions on a conceptual level," except in those cases where sufficient information is available to provide project-specific analysis. The EIS/CCP at issue here contains the Service's refuge management strategies for five of the six refuges in the Klamath Refuge Complex. For many years prior to the promulgation of the EIS/CCP, portions of both the Tule Lake and Lower Klamath Refuges had been leased by the government to private entities for agricultural use. In the EIS/CCP, the Service adopted management strategies that required modifications to agricultural uses on lease land in both refuges.

The Service based the EIS/CCP's required modifications of agricultural uses on the leased land on its interpretations of the Kuchel and Refuge Acts. In Appendix M to the EIS/CCP, the Service provided an extensive analysis of the Kuchel Act. The Service wrote that "'proper waterfowl management' is *the major purpose of the Act*." (Emphasis added.) The Service added:

> [T]here are additional secondary refuge purposes related to agriculture derived from the Kuchel Act. The Kuchel Act directs that the Secretary continue the "present pattern of leasing," maximize lease revenues in specifically identified areas of the refuges, and optimize agriculture, all consistent with

waterfowl management. . . . *Because the Kuchel Act provides that agricultural leasing will continue in specific areas of the refuges if consistent with proper waterfowl management, the Service must continually evaluate agricultural uses and cropping patterns to ensure that they are consistent with proper waterfowl management.*

(Emphasis added.)

The Service interpreted the Refuge Act to require the same evaluation of agricultural uses as the Kuchel Act. In Appendix G to the EIS/CCP, the Service wrote, "In reviewing the language in both statutes, the Service concluded that the term 'consistent therewith' in the Kuchel Act has the same meaning as 'compatible' under the [Refuge Act]."

For the Tule Lake Refuge, the Service considered three agricultural management alternatives. One was a no-action alternative. The other two alternatives contained provisions regulating agricultural uses on lease land in the refuge, such as requiring a lessee to leave an increased acreage of standing grain unharvested for dappling duck and geese, and expanding a flooding program known as the "walking wetlands" program. The Service selected Alternative C, which included expansions of both the unharvested standing grain requirement and the walking wetlands program. Under the EIS/CCP, lease land contracts on the Tule Lake Refuge are also subject to additional conditions, such as a requirement to flood lease lands post-harvest, restrictions on harvesting methods, and a prohibition of post-harvest field work.

For the Lower Klamath Refuge, the Service considered four alternatives. One was a no-action alternative. The other three alternatives contained provisions applicable to agriculture on leased land in the refuge, similar to those for the leased land in the Tule Lake Refuge. The Service selected Alternative C, which included an increase in the unharvested grain requirement, a requirement for annual Special Use Permit ("SUP") applications by the Bureau of Reclamation to ensure support of waterfowl habitats, and an increase of flood fallow agricultural practice "if needed to achieve habitat objectives."

## II. Proceedings Below

A magistrate judge issued a Report and Recommendation in which he recommended granting summary judgment to the Service. The district court adopted the recommendation of the magistrate judge in its entirety and entered summary judgment to the Service. TID timely appealed.

## III. Standard of Review

"We review summary judgment rulings de novo." *Native Ecosystems Council v. Marten*, 883 F.3d 783, 789 (9th Cir. 2018) (citing *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1256 (9th Cir. 2017)). When reviewing an agency's statutory interpretation, we apply *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). We first ask "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If it has not, we defer to the agency's construction as long as it "is based on a permissible construction of the statute." *Id.* at 843.

## IV.  Arguments on Appeal

TID argued in the district court and argues here that the EIS/CCP's requirements, applicable to leased agricultural lands in the Tule Lake and Lower Klamath Refuges, violate the Kuchel and Refuge Acts.  First, TID argues that under the Kuchel Act "all lease land farming is automatically consistent with waterfowl management," and that the Service is therefore not authorized to limit agricultural uses on leased land in the two refuges to ensure "consistency" with proper waterfowl management.  Second, TID argues under the Refuge Act that lease land farming is a "purpose," not a "use," of the Klamath Refuges, and that the Service is therefore not authorized to regulate agriculture practices to ensure "compatibility" with the purposes of the refuges.  We address each argument in turn.

## A.  The Kuchel Act

TID argues that the Kuchel Act does not authorize the Service to regulate agricultural uses of lease land in the refuges to ensure consistency with "proper waterfowl management."  TID relies on § 695n of the Act to support its argument.  We quoted § 695n above.  For the convenience of the reader, here it is again in relevant part:

> The Secretary shall, *consistent with proper waterfowl management*, continue the present pattern of leasing [specified] reserved lands . . . within the Executive order boundaries of the Lower Klamath and Tule Lake National Wildlife Refuges . . . .

16 U.S.C. § 695n (emphasis added).  TID argues that because the phrase "consistent with proper waterfowl management" is set off by commas it is a "nonrestrictive" clause.  TID writes in its brief to us: "'Consistent with proper waterfowl management' is not an operative phrase in the sentence.  It is a nonrestrictive clause that, by definition, is not essential to the meaning of the sentence."  TID argues that the clause simply clarifies that "the present pattern of leasing *is* consistent with proper waterfowl management."  (Emphasis in original.)

Even if we were to consider the language of § 695n in isolation from the rest of the Kuchel Act, we would disagree.  When construing a statute, courts should "avoid any statutory interpretation that renders any section superfluous." *Cent. Mont. Elec. Power Co-op, Inc. v. Adm'r of Bonneville Power Admin.*, 840 F.2d 1472, 1478 (9th Cir. 1988).  This canon holds true, as well, for interpretations of language within a single section. *See Lockhart v. United States*, 577 U.S. 347, 354–57 (2016).  TID admits that its proposed interpretation of § 695n would render superfluous the phrase "consistent with proper waterfowl management."  In contrast, the Service's interpretation gives the phrase a distinct meaning and function within the section.  Under the Service's interpretation, the phrase requires the Service to ensure that the agricultural uses of lease land are consistent with proper waterfowl management.

However, we do not consider the language of § 695n in isolation.  Rather, as TID itself recognizes, we must construe it in light of the rest of the Kuchel Act.  Even if the meaning of § 695n were unclear, "[i]t is necessary and required that an interpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives

instruction as to its meaning." *Maracich v. Spears*, 570 U.S. 48, 65 (2013). Unlike TID's interpretation of § 695n, the Service's interpretation comports with the entirety of the Kuchel Act. Other parts of the Act unambiguously prioritize wildlife management objectives over agricultural uses on leased land. Section 695k of the Act specifies that the "policy" of Congress in the Klamath Refuge Complex is "to preserve intact the necessary existing habitat for migratory waterfowl." 16 U.S.C. § 695k. Section 695*l*, quoted above, requires the Secretary to administer "all lands" in the Klamath Refuge Complex "for the major purpose of waterfowl management, but with full consideration to optimum agricultural use *that is consistent therewith.*" *Id.* § 695*l* (emphasis added).

We therefore reject TID's interpretation of § 695n. With respect to the textual argument made by TID, the language of § 695n, whether considered in isolation or in the context of the rest of the Kuchel Act, is unambiguous. We therefore do not need to proceed to step two of the *Chevron* analysis. We hold that the Kuchel Act requires the Service to regulate the pattern of lease land agriculture in the refuges to ensure consistency with proper waterfowl management.

## B. The Refuge Act

The Refuge Act requires a CCP to "identify and describe . . . the purposes of each refuge." 16 U.S.C. § 668dd(e)(2)(A). The Secretary may "permit the use of any area" within a refuge "whenever [s]he determines that such uses are compatible with the major purposes for which such areas were established." *Id.* § 668dd(d)(1)(A). Subject to an exception not relevant here, the Secretary "shall not . . . expand, renew, or extend an existing use of a refuge, unless

the Secretary has determined that the use is a compatible use." *Id.* § 668dd(d)(3)(A)(i). A "compatible use" is a "use of a refuge that . . . will not materially interfere with or detract from the fulfillment of the . . . purposes of the refuge." *Id.* § 668ee(1).

TID argues that agriculture on lease land in the refuges is a "purpose" rather than a "use" within the meaning of the Refuge Act, and that agriculture on lease land therefore has co-equal status with waterfowl management. As a result, according to TID, agricultural use of lease land is not subject to a compatibility determination by the Service. We disagree.

"It is an elementary principle of statutory construction that similar language in similar statutes should be interpreted similarly." *United States v. Sioux*, 362 F.3d 1241, 1246 (9th Cir. 2004) (citing *Northcross v. Bd. of Educ. of Memphis City Schs.*, 412 U.S. 427, 428 (1973)); *see also Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 738–39 (1989) (Scalia, J., concurring). When the Refuge Act is read in conjunction with the Kuchel Act, it is apparent that agriculture on lease land in the refuges is not a "purpose" holding co-equal status with waterfowl management, and that lease land agriculture is not insulated from a compatibility determination.

We look to the Kuchel Act to understand the distinction drawn in the Refuge Act between a "purpose" and a "use." Section 695*l* of the Kuchel Act, quoted above, characterizes "waterfowl management" as the "major purpose" of the refuges, and provides that agriculture is a "use." For the convenience of the reader, here it is again in relevant part:

> *Notwithstanding any other provisions of law*, [refuge] lands . . . are hereby dedicated to

wildlife conservation. *Such lands shall be administered by the Secretary of the Interior for the major purpose of waterfowl management, but with full consideration to optimum agricultural use that is consistent therewith.*

16 U.S.C. § 695*l* (emphases added). We recognize that the Executive Orders establishing the Lower Klamath and Tule Lake Refuges in the 1920s characterized reclamation (*i.e.*, agriculture) as a purpose of the refuges. However, as made clear by its introductory phrase "[n]otwithstanding any other provision of law," § 695*l* supersedes those orders.

We therefore reject TID's argument that agriculture is a co-equal purpose rather than a "use" within the meaning of the Refuge Act. With respect to the textual argument made by TID, the language of § 695*l* is unambiguous, making it unnecessary to proceed to step two of the *Chevron* analysis. We hold that the Refuge Act permits agricultural "use" within the Klamath Refuge Complex only when the Service determines that it is "compatible with the major purposes" for which such the area was established.

## Conclusion

We hold under both the Kuchel and Refuge Acts that the Service is required to ensure that agricultural use of leased land in the Lower Klamath and Tule Lake Refuges is "consistent" with (Kuchel Act) and "compatible" with (Refuge Act) "proper wildlife management." We hold, further, that the regulation in the EIS/CCP of agricultural uses

of lease land is a proper exercise of the Service's authority under the Kuchel and Refuge Acts.

**AFFIRMED.**