NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

OCT 26 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

WESTERN WATERSHEDS PROJECT; et al.,

          Plaintiffs-Appellants,

  v.

DOUGLAS C. MCKAY, District Ranger, Paisley & Silver Lake Ranger Districts, Fremont-Winema National Forests; et al.,

          Defendants-Appellees.

No. 22-35706

D.C. No. 1:19-cv-00516-MC

MEMORANDUM[*]

Appeal from the United States District Court
for the District of Oregon
Michael J. McShane, District Judge, Presiding

Argued and Submitted October 19, 2023
Portland, Oregon

Before: GILMAN,[**] KOH, and SUNG, Circuit Judges.

Western Watersheds Project and other environmental organizations

(collectively, "Plaintiffs") appeal the district court's grant of summary judgment in

---

     [*]    This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

     [**]    The Honorable Ronald Lee Gilman, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

favor of the U.S. Forest Service ("USFS") on Plaintiffs' claims under the National Environmental Policy Act ("NEPA") and the National Forest Management Act ("NFMA"), and to the U.S. Fish and Wildlife Service ("FWS") on Plaintiffs' claims under the Endangered Species Act ("ESA"). We have jurisdiction under 28 U.S.C. § 1291. We affirm in part and reverse in part.

1. Plaintiffs contend that USFS's Final Environmental Impact Statement ("FEIS") failed to take a "hard look" at three key issues regarding threats to Oregon spotted frogs: (1) direct impacts such as trampling, (2) climate change and increasing drought, and (3) population-level effects. "In reviewing the adequacy of an EIS, we apply the 'rule of reason' standard, which requires a 'pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation.'" *Native Ecosystems Council v. Marten*, 883 F.3d 783, 795 (9th Cir. 2018) (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005)).

The FEIS here satisfies this standard because it "contains a 'reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *City of Los Angeles v. FAA*, 63 F.4th 835, 849 (9th Cir. 2003) (quoting *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 984 (9th Cir. 2022)). The FEIS rationally explained its decision to focus on habitat characteristics rather than frog numbers. The FEIS also acknowledged the threats

2

posed by trampling (and other direct impacts) and climate change. Although the FEIS did not specifically compare the magnitude of these particular threats across alternatives, the FEIS included sufficient information for a reader to understand how the different grazing strategies would affect these threats, thus allowing for an "informed comparison of alternatives." *Marten*, 883 F.3d at 795 (citation omitted). Our review only goes that far. *See Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1181 (9th Cir. 2011) ("[We] may not impose 'upon the agency [our] own notion of which procedures are 'best' . . . [and] cannot mandate that a [Supplemental Environmental Impact Statement] include a particular graph, no matter how helpful." (second alteration in original) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978))). We affirm the district court's grant of summary judgment to USFS on the NEPA claims.

2.      Plaintiffs next argue that USFS failed to demonstrate the project's consistency with the Winema National Forest Plan. The use standard in the Allotment Management Plan ("AMP") allowing for up to 20 percent "alteration" in fenced areas and fens is not, as Plaintiffs contend, inconsistent with the Forest Plan's requirement that "[t]he cumulative total area of detrimental soil conditions in riparian areas shall not exceed 10 percent of the total riparian acreage within an activity area." In addition to the fact that the Forest Plan requirement is a

3

cumulative total while the AMP standard is not, the AMP's use of "alteration" is not specific to soil.[1]  USFS's reliance on its expert report's conclusion that the AMP's framework would "limit impacts on the soil resource to acceptable thresholds of the Forest Plan" was not arbitrary and capricious.  Similarly, the AMP's streambank standards are not inconsistent with the Forest Plan.  The AMP's 95 percent streambank stability goal was specifically formulated "to meet the intent of . . . the Forest plan," and USFS has sufficiently explained why allowing 20 percent streambank "alteration" is consistent with the Forest Plan's 5 percent streambank "degradation" limit.

Plaintiffs further contend that USFS could not legitimately assess the new grazing framework's consistency with the Forest Plan without accounting for longstanding trespass and noncompliance problems with grazing in the project area.  However, the agency acknowledged that unauthorized use would occur and sufficiently explained why measures that had been insufficient to eliminate unauthorized use in the past could be expected to be reasonably effective under the new AMP.  Even if, as Plaintiffs contend, USFS undercounted past trespass incidents, the agency's emphasis on the differences between the past grazing

---

[1] Plaintiffs also point to the AMP's "long-term desired condition" of "<20% increase in bulk density," without acknowledging that the Forest Plan provides that "an increase in soil bulk density of 20 percent or more" is the point at which compaction becomes a "detrimental soil condition."

framework under which trespass issues occurred and the new grazing framework renders any such error harmless. *See Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 969 (9th Cir. 2015) (stating that the burden is on "the opponent of the action to demonstrate [that] an error is prejudicial"). We affirm the district court's grant of summary judgment to USFS on the NFMA claims.

3. In contrast to the FEIS's discussion of climate change, the discussion of climate change in FWS's 2018 Biological Opinion ("BiOp") was deficient. The BiOp does not account for climate change as a cumulative effect or baseline condition. Although the BiOp considered how drought conditions might harm the frogs, the BiOp nevertheless failed to consider how climate change will impact frogs in nondrought years. The BiOp needed to consider whether the small frog population could sustain grazing-related impacts on top of potential climate change effects, which, according to documents in the record, include stranding and higher egg mortality due to increased exposure to ultraviolet radiation and pathogens. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 930 (9th Cir. 2008) ("[A]n agency may not take action that will tip a species from a state of precarious survival into a state of likely extinction" or action "that deepens [existing] jeopardy by causing additional harm").

The BiOp acknowledged the threat that low water conditions pose to Oregon spotted frogs in Jack Creek. However, unlike the FEIS, the BiOp altogether failed

5

to engage with information in the record suggesting that climate change would affect water levels and streamflow.[2]  Although the agency now contends in its briefing to this court that the climate change information was too speculative to affect the jeopardy determination "on the timeframe considered," we cannot affirm on that basis because FWS did not explain any such conclusion in the BiOp.  *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 523 (9th Cir. 2010) ("[FWS] was required to issue a comprehensive biological opinion taking a long view of the [project's] effects on [the listed species], or to explain adequately why any such effort would be unproductive in assessing the long-term impact of the [project] on the [species]."); *Nat'l Wildlife Fed'n*, 524 F.3d at 932 n.10 ("[W]e may not consider [an agency's] post hoc justification, or infer 'an analysis that is not shown in the record.'" (quoting *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,

---

[2] For example, FWS's own ESA listing, while finding the effects of climate change across the entire Oregon spotted frog population uncertain, noted that climate change models project that "[s]nowmelt-dominated watersheds" such as the one at issue here will see "reduced peak spring streamflow, increased winter streamflow, and reduced late winter flow."  More specifically, the Jack Creek Oregon Spotted Frog Site Management Plan notes that "[c]hanges in climate are predicted to reduce winter snowpack and decrease spring runoff from snowmelt," which "may reduce the amount of water in the Jack Creek system in summer and fall."  A 2009 Draft Site Management Plan for Jack Creek Spotted Frogs, included in FWS's administrative record, states that climate change predictions suggest that "more of the perennial reaches of Jack Creek will likely become intermittent" and that "low water conditions will come earlier in the year, persist longer, and be more extreme."

378 F.3d 1059, 1074 (9th Cir. 2004))).[3] Because FWS failed to address available information indicating that climate change would make low water conditions—an acknowledged threat for Oregon spotted frogs—more frequent or severe, it failed to consider an important aspect of the problem.

The BiOp's reliance on mitigation strategies that would exclude cattle from critical frog habitat during low water conditions does not render this failure harmless. First, the agency has pointed to no information suggesting that the low water mitigation strategies were developed with climate change in mind. *See Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1028–29 (9th Cir. 2011) (finding that reliance on management strategies did not cure a BiOp's failure to consider a potential threat because those strategies were not developed to be responsive to that threat).

Second, "[m]itigation measures relied upon in a biological opinion must constitute a 'clear, definite commitment of resources,' and be 'under agency control or otherwise reasonably certain to occur.'" *Ctr. for Biological Diversity v.*

---

[3] Because the "uncertainty" rationale does not appear in the BiOp, FWS's reliance on *Turtle Island Restoration Network v. U.S. Department of Commerce*, in which the "*BiOp* demonstrated that the [agency] considered a variety of ways in which climate change may affect sea turtles, but simply concluded that the data available was too indeterminate for the agency to evaluate potential sea-turtle impacts with any certainty," does not help its case. 878 F.3d 725, 740 (9th Cir. 2017) (emphasis added).

*Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020) (quoting *Nat'l Wildlife Fed'n*, 524 F.3d at 936 & n.17).  "The measures 'must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards.'" *Id.* (quoting *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002)).  Here, the mitigation measures do not meet those requirements.  Identification of low water conditions depends on field visits, but the AMP provides no schedule or standard for such visits, providing only that they will occur "as possible" and "as the opportunity arises."  Absent a "specific and binding plan[]" for these visits, it was arbitrary and capricious for FWS to rely on the effectiveness of the low water mitigation strategies in concluding that there would be no jeopardy.  *See Nat'l Wildlife Fed'n*, 524 F.3d at 935–36.  Moreover, even assuming that some field visits would occur and identify low water conditions, it is not clear that the BiOp considered harm that might occur in low water periods during the time it would likely take to identify those conditions and implement the low water mitigation strategies.

We also note that even if FWS could have found that extirpation of the Jack Creek Oregon spotted frog population "would not jeopardize the survival or recovery of the species," FWS "did not make that finding."  *Salazar*, 628 F.3d at 529.  "[A]n agency's action must be upheld, if at all, on the basis articulated by the

8

agency itself." *Id.* (quoting *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005)). Further, as in *Salazar*, it is "far from obvious that the extirpation of the [Jack Creek] population would be harmless." *Id.* For example, the BiOp notes that Oregon spotted frog survival and recovery depends on maintaining populations of Oregon spotted frogs across their current range and ensuring connectivity between populations. It thus appears that extirpation of the Jack Creek population would "reduce appreciably the likelihood of both the survival and recovery of [Oregon spotted frogs] by reducing the reproduction, numbers, or distribution of th[e] species," 50 C.F.R. § 402.02, and the agency has not concluded otherwise.

Therefore, we reverse the grant of summary judgment to FWS on the ESA claim. FWS has not shown that equity demands that the BiOp be left in place. *See All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121–22 (9th Cir. 2018) (noting that "vacatur of an unlawful agency action normally accompanies remand" unless "equity demands" otherwise). On remand, the district court is instructed to vacate FWS's 2018 BiOp and remand to FWS for further proceedings consistent with this opinion.

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**[4]

---

[4] The parties shall bear their own costs.